**Affirmed and Opinion Filed July 20, 2017**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-01333-CR

### EILEEN FRANCES NORTH, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 5**
**Dallas County, Texas**
**Trial Court Cause No. F-1435144-L**

## MEMORANDUM OPINION

Before Justices Bridges, Evans, and Whitehill
Opinion by Justice Bridges

Eileen North appeals her murder conviction. A jury convicted appellant and sentenced her to ninety-nine years' confinement. In three points of error, appellant contends that she received ineffective assistance of counsel, the evidence in this case is insufficient to support the jury's verdict, and the trial court erred in admitting certain evidence during the State's case-in-chief. We affirm the trial court's judgment.

At approximately 10:40 a.m. on December 3, 2014, Athena Tanno called her coworker and best friend, Rosemary Milazzo, to tell her things were "crazy busy at work so to hurry up and come to work." During the conversation, Rosemary's dogs began barking. Athena told Rosemary, "Oh, I'll let you go. Someone must be at your house." Rosemary did not show up at work. Athena "kept calling" Rosemary but got no answer. Athena's boss would not allow her

to leave work to check on Rosemary, so Athena stopped by Rosemary's house after work to check on her. Athena knocked and called Rosemary's name but received no response. Athena went to the back door, looked inside Rosemary's house, and "just saw blood." Athena ran to a neighbor's house and called 911.

Irving police officer Dale Gant arrived, and Athena described seeing a ladder and a "red substance" on the floor when she looked through a back window. Gant and Athena went to the back of the house where Gant looked through the window, saw "a lot of blood on the floor" and what appeared to be bare footprints in the blood. Gant sent Athena to the front of the house, called for backup, and kicked in the back door. When Gant entered the kitchen, he saw Rosemary's body lying on her back beside an open oven. Gant smelled natural gas and saw that the burner on the back right was aflame. Gant did not approach Rosemary's body, but he saw that she was not breathing and, "based on the amount of blood," he believed she was dead. Backup officers arrived and, even though there was a potential for the house to explode, assisted Gant in securing the home to ensure there were no other victims or a suspect present. Gant noticed that the bloody footprints led down a hallway. The fire department arrived and shut off the gas at the home. Gant concluded that, by turning a burner on and leaving the oven open so that gas could escape, "somebody was trying to set the house to explode." Gant maintained the security of the crime scene until crime scene investigators arrived.

Elmer Sims, a firefighter with the Irving fire department, arrived at the scene and saw a car in the driveway and a "lady" standing next to the driver's door. Someone asked the lady to move out of the driveway and "just down the road just a little bit, not out of sight." With the car gone, Sims discovered a wallet lying in the driveway. Sims opened the wallet, saw a driver's license, "realized this is not one of our guy's," and notified police of his discovery. Irving police

officer Eric Mosby determined the wallet contained a Texas identification card, health insurance card, and a note with the name "Nicole" and a telephone number on it.

Irving police detectives Eric Curtis and Kevin Burkleo arrived at the scene. Because Rosemary had several daughters who lived at the house, Curtis obtained a search warrant for the house. The detectives entered the house through the back door and saw Rosemary's body and "blood and footprints all over the house." There was only one set of footprints, and Burkleo at first thought the footprints were bare footprints; however, further examination revealed them to be sock prints. The sock prints went from the kitchen area to the back door and into the garage area, living room, down a hall to a closet that held a water heater and furnace, and to the front door where they stopped right at the edge of the door. When officers first arrived, the door to the closet holding the water heater and furnace, both of which ran on natural gas, was open, and the filter had blood on it and had been pulled out of the closet. The pilot lights on both the water heater and furnace were lit.

Based on the number of stab wounds inflicted on Rosemary, Curtis and Burkleo believed the murder to be "overkill," and "way excessive to try to kill somebody." Burkleo, based on his training and experience, knew overkill "tends to have to do with rage, anger or lust" and indicated the murder was committed by someone Rosemary knew. Burkleo also concluded that the way Rosemary's purse "just looked dumped out" and did not look "gone through" indicated "it was just staged." Curtis and Burkleo also learned there was no forced entry into Rosemary's house. The wallet found in the driveway appeared to be "tossed out there or fell out of a car."

Following their investigation of the crime scene, Curtis and Burkleo interviewed Rosemary's friends and family to get further information and footprint samples. They also located and interviewed Oscar Alvarez, the man whose wallet was found in Rosemary's driveway. When Burkleo first saw Alvarez, he did not have any cuts or scrapes and he

"looked a little bigger" than Burkleo would have expected based on the size of the footprints at the murder scene. Alvarez provided DNA samples and footprints, which were "not at all" the right size. Alvarez also told police he lost his wallet in July 2014, and he was working "a big job where we had to make a big hole" in Irving and "making trips back and forth to Home Depot" at the time. Detectives confirmed the statements of Mr. Alvarez. Credit card records showed Alvarez made purchases on his company credit card at Home Depot on July 24, 2014. Police later determined Home Depot records showed appellant was working at Home Depot on July 24, 2014.

In speaking with Athena on multiple occasions, Burkleo learned appellant's identity as being "another friend [police] could talk to about getting background information." Appellant came in for an interview on December 9, 2014. Appellant appeared "like she had been using some methamphetamine lately." Burkleo knew that a methamphetamine user's "mouth moves a lot," and methamphetamine affects the nervous system and "causes them to move around uncontrollably a lot." Appellant told Burkleo she worked at Home Depot in Irving. Appellant claimed that she was last at Rosemary's home on December 1, 2014. Appellant said she was home on the morning of December 3, 2014 and went to work around 12:30 and worked the rest of the day. Appellant refused to provide DNA and footprint samples. Appellant urged detectives to look into family members and a drug dealer named "Padilla," to whom Rosemary owed money. Appellant said Rosemary kept drugs in her bedroom and sold appellant half a gram of methamphetamine on December 1. Appellant left at the conclusion of the interview.

The day following the interview with appellant, appellant was involved in a single-vehicle car crash. William Russell Spencer, a special agent with the Air Force Office of Special Investigations, witnessed appellant's SUV travel "from the left lane straight across onto exiting the freeway" and roll "multiple times, coming to rest on the driver's side door. No other vehicles

–4–

were involved in the crash and no other vehicles were attempting to run appellant's SUV off the road. Spencer stopped to help appellant, approached the SUV, and saw appellant alone inside appearing "dazed." By this time, other bystanders were trying to push the SUV over, and Spencer told them to stop. Someone opened the back of the SUV, and Spencer and others were moving things out of the SUV to gain entry. Spencer told appellant to "come out the back" and that it was easy to exit the SUV. Appellant was moving, but she seemed "agitated" and said "No. No. Leave me alone." At that point, appellant began kicking the windshield. Appellant "was getting some good leverage on the windshield," and someone "picked up a board and put it through the windshield." Appellant grabbed the windshield and, at first, Spencer thought she was trying to "rip the hole bigger so she could get out." Instead, appellant broke off a piece of glass and "starts cutting her throat with it, rubbing it across her throat saying 'No. No. No.'" Appellant began rubbing the glass against her wrist, and Spencer's partner was able to handcuff appellant's left wrist and "kind of torqued it back, which stopped her actions." Two female bystanders talked to appellant and calmed her down. Spencer remained in the back of the vehicle until the fire department arrived.

Following appellant's crash, detectives called the Arlington pound to locate appellant's SUV, but they were told appellant had picked it up. Detectives conducted a follow-up interview to ask appellant about the crash and her knowledge of the murder. Appellant said her SUV was at the pound and denied picking it up, which turned out to be true. Burkleo told appellant she "needed remorse for this heinous act that happened," and appellant said she had remorse for it but then "realized and changed" and said she did not "need any remorse." Burkleo told appellant "she knew her cell phone was going to put her there at the scene," and appellant's "head kind of sunk down." Shortly thereafter, appellant admitted "she was there at the scene." Appellant told Burkleo, "I walked in on it." Appellant said she "walked into the kitchen, and she observed the

–5–

victim lying in a pool of blood up against the stove." Appellant called out to Rosemary, who "gurgled," and appellant could hear somebody in the back room, so she "ran out." When pressed, appellant said she "didn't see 'em but she heard him in there." Appellant said, "all she knew, it was a Mexican and he had blood all over him." Burkleo asked appellant to describe the Mexican, and appellant said he was Hispanic with short hair, taller than she was, and he had blood all over him. When asked for clarification, appellant said "she was in the kitchen area and the Mexican came out and grabbed ahold of her." Appellant said she "kicked him in the balls and left."

Appellant asked about the wallet found at the scene and said a man named "Doyle McQueen had told her that we found a wallet and that one of the daughters had identified the guy out of the wallet." Burkleo thought this was strange because police had not told anyone about the wallet. When Burkleo asked why appellant had not called police, she said she was scared and then said she could not get to her phone because it was in her truck, yet she said she went to her truck and drove home. Finally, appellant said the "Mexican" was the same person who "tried to run her off the road during the crash." Appellant said, "I'm done" and stood up, which Burkleo interpreted as "an unambiguous termination of the interview." Burkleo and the other officer present stood up and left the room, and appellant also left.

Burkleo decided there was "more than enough probable cause to make an arrest for murder," so Burkleo sent oficers to secure appellant's house while he got a search warrant. Burkleo got the search warrant and searched appellant's house. Police also obtained a search warrant to get appellant's DNA and footprint. Appellant's footprints were similar in both shape and size to the sock prints found at the crime scene.

Appellant was indicted for murder. At trial, Michael Tillman testified he knew Rosemary and her children and Rosemary's deceased husband, David Dixon. Tillman met appellant at

Dixon's funeral, and appellant told him "she was the one that had introduced Rosemary and David back when they first began to date, and [appellant] caused [Rosemary] to get married." Tillman saw appellant after the funeral "on several occasions." The last time Tillman saw appellant, he asked about Rosemary, and appellant "said that Rosemary and she did not speak anymore and that she knew that Rosemary killed David and that she took money from the life insurance policy and bought a new truck." Appellant was "very vengeful, hateful, and spiteful.

Doyle McQueen testified he knew both Rosemary and appellant for thirty years. On the day of the murder, Dixon's brother called McQueen and told him about Rosemary's murder. McQueen called appellant, who "started crying" and "acted like she had no idea that anything had happened to Rosemary. Appellant said nothing about being at Rosemary's house that day, seeing blood at the house, or listening to Rosemary gurgle.

Medical examiner Chester Gwin testified Rosemary suffered seven stab wounds and at least sixteen incised wounds. Gwin determined the cause of death was sharp-force injuries, and the manner of death was homicide. Christina Capt, a forensic DNA analyst at the University of Texas Health Science Center, testified she received an initial set of six items in this case to test for possible blood, including swabs from Rosemary's house and samples from Rosemary including right-hand nail clippings, and an oral swab from Rosemary. Later, Capt received a second set of items from appellant's car and a pair of appellant's shoes. The swab from the lower dash of appellant's SUV tested positive, with a reasonable degree of scientific certainty, for Rosemary's DNA. The insole of appellant's right shoe tested "presumptive positive for blood," although Capt could not determine whose blood it was. The jury found appellant guilty and sentenced her to ninety-nine years' confinement. This appeal followed.

In her first point of error, appellant argues she received ineffective assistance of counsel. Specifically, she argues that her trial counsel unreasonably failed to object to or contest the

admissibility of statements made during appellant's interview with detectives where she was not given her *Miranda* warnings. Appellant argues the only evidence linking her to the murder was her inculpatory statement, which was the product of an interrogation process calculated to circumvent *Miranda*.

Under *Strickland v. Washington*, 466 U.S. 668 (1984), appellant must prove that his trial counsel's representation was deficient and that the deficient performance was so serious that it deprived him of a fair trial. *Id.* at 687. Counsel's representation is deficient if it falls below an objective standard of reasonableness. *Id.* at 688. This deficiency will deprive appellant of a fair trial only when counsel's performance prejudices appellant's defense. *Id.* at 691–92. To demonstrate prejudice, appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the claim of ineffectiveness. *Id.* at 697. This test is applied to claims arising under both the United States and Texas Constitutions. *See Hernandez* v. State, 726 S.W.2d 53, 56–57 (Tex. Crim. App. 1986).

A sound trial strategy may be imperfectly executed, but the right to effective assistance of counsel does not entitle a defendant to errorless or perfect counsel. *See Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). As a reviewing court, we look to the totality of the representation and to the circumstances of the case, not to isolated instances in the record reflecting errors of commission or omission. *Id.* Moreover, we consider the adequacy of assistance as viewed at the time of trial, rather than through hindsight. *Id.* at 482.

Our review of defense counsel's performance is highly deferential, beginning with the strong presumption that the attorney's actions were reasonably professional and motivated by sound trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

Ordinarily, counsel must be accorded an opportunity to explain his actions before being condemned as unprofessional and incompetent. *See Bone v. State* 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). When the record is silent as to trial counsel's strategy, we will not conclude that appellant received ineffective assistance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

Here, appellant argues trial counsel was ineffective in failing to move to suppress or object at trial to the admission of appellant's confession "I walked in on it." However, the record shows appellant did not confess to killing Rosemary and, instead, gave varying accounts of her encounter with a "Mexican" at Rosemary's house. Counsel may have avoided objecting to appellant's statement that she "walked into it" in order to avoid any characterization of this statement as a "confession." Because the record is silent as to why trial counsel failed to object to appellant's statement that she "walked into it," appellant has failed to meet her burden under the first prong of *Strickland*. *See Strickland*, 466 U.S. at 697. Under these circumstances, we cannot conclude appellant received ineffective assistance of counsel. *See Goodspeed*, 187 S.W.3d at 392; *Thompson*, 9 S.W.3d at 813. We overrule appellant's first issue.

In his second issue, appellant argues the evidence is legally insufficient to prove she murdered Rosemary. Specifically, appellant argues the evidence is legally insufficient to establish her identity as the murderer. Appellant argues the evidence shows the murderer left only bloody sock prints at the murder scene, the evidence fails to show the sock prints belong to her, and there is no other probative evidence to prove the element of identity.

When reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the credibility of witnesses and of the weight given to their testimony, any conflicts or inconsistencies in the evidence are resolved in favor of the verdict. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Our review includes both properly and improperly admitted evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Id.*

A person commits murder if she intentionally or knowingly causes the death of an individual or, with the intent to cause serious bodily injury, she committs an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011).

Here, the evidence showed sock prints found at the murder scene indicated there was only one other person, the murderer, with Rosemary at the time she was murdered. Appellant's footprints were strikingly similar to the sock prints found at the murder scene. Appellant's statements to police placed her at Rosemary's house at the time of the murder, though she blamed the attack on a "Mexican." Rosemary's DNA was found on the dashboard of appellant's car. The insole of appellant's right shoe tested "presumptive positive for blood," although Capt could not determine whose blood it was.

Appellant was involved in a single-car crash following her first interview with police, she attempted to cut her throat and left wrist after the crash, and she later claimed a "Mexican" ran her off the road in an attempt to support her story of the "Mexican's" involvement in the murder. However, Spencer testified that appellant's SUV came across traffic and rolled by itself and was not interacting with or near any other vehicle at the time of her accident. It was reasonable for the jury to infer from all the evidence that appellant was attempting to commit suicide out of guilt for committing the murder. *See Johnson v. State*, 208 S.W.3d 478, 500 (Tex. App.—Austin 2006, pet. ref'd) (evidence of defendant's suicide plans relevant to show consciousness of guilt).

Appellant was working at Home Depot the day Alvarez lost his wallet. During an interview with detectives, appellant mentioned the wallet found in Rosemary's driveway. The detectives, however, had not discussed the wallet with any other witness or suspect other than Alvarez. They never released information about the wallet to the public. Nevertheless, appellant knew about the wallet and claimed to have learned about it from a friend. The jury could reasonably infer that appellant found Alvarez' wallet at the Home Depot where she worked and planted it in Rosemary's driveway to direct suspicion away from her. We conclude that, based on the evidence presented at trial, the jury could find beyond a reasonable doubt that appellant murdered Rosemary. *See Temple*, 390 S.W.3d at 360. We overrule appellant's second issue.

In her third issue, appellant argues the trial court erred by admitting State's exhibit 642, a summarized timeline of the events leading up to and following Rosemary's murder, and the improper admission was harmful. The timeline was prepared by Curtis. Appellant complains the timeline inaccurately states: (1) Alvarez made a purchase at Home Depot where appellant was working on July 24, 2014 and lost his wallet, (2) appellant was "4 minutes late" for work on the day of the murder, (3) appellant "intentionally" crashed her vehicle, and (4) appellant "confesses" at her second interview. Although one item on the time line was titled "Eileen North

interview at Irving police 2nd time confesses," the body of the item specified appellant was "interviewed & confessed to seeing [Rosemary's] body." Appellant further complains that some of the language in the summarized timeline was "an effort by the State to convince the jury that Detective Curtis' opinion was fact" and was "obviously argument."

The law is clear that while the trial court has discretion to permit the use of visual aids and charts in the summarizing of evidence, such visual aids may only be admitted into evidence if they are relevant. TEX. R. EVID. 402 (admission of relevant evidence); *Markey v. State*, 996 S.W.2d 226, 231 (Tex. App.—Houston [14th Dist.] 1999, no pet.). "[A] mere summary of other evidence already before the jury constitutes no proof of any fact in issue." *Markey*, 996 S.W.2d at 231. It has no inherent probative value and can rarely provide any significant assistance to the trier-of-fact. *Id.* While rule of evidence 1006 contemplates the admission of summaries in certain instances, the rule in no way indicates that a prosecutor can summarize her case on legal paper and submit those documents to the jury. *Wheatfall v. State*, 882 S.W.2d 829, 839 (Tex. Crim. App. 1994).

However, even assuming the trial court erred in admitting the summarized timeline into evidence, the record does not show appellant was harmed by its admission. The erroneous admission of evidence under rule 1006, regarding the admission of summaries, is analyzed for harm as non-constitutional error. TEX. R. APP. P. 44.2(b); *Markey*, 996 S.W.2d at 232. Thus, the error will not require reversal unless it affected appellant's substantial rights. TEX. R. APP. P. 44.2(b).

This case was complex and the trial lasted 10 days. During that time, the State introduced over 640 exhibits, and twenty witnesses testified. State's exhibit 642 is a summarized timeline of the events leading up to and following Rosemary's murder. The jury heard evidence that supported the alleged "inaccuracies" of which appellant complains. Appellant had the

opportunity to cross-examine Curtis about whether Alvarez actually lost his wallet at Home Depot and whether Curtis lied to appellant in questioning her about the crash. Because all the evidence presented in the summarized timeline was duplicitous of other evidence already presented, any error in the admission of the timeline was harmless beyond a reasonable doubt. *Wheatfall*, 882 S.W.2d at 840. We overrule appellant's third issue.

We affirm the trial court's judgment.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
151333F.U05

–13–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

EILEEN FRANCES NORTH, Appellant

No. 05-15-01333-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 5, Dallas County, Texas
Trial Court Cause No. F-1435144-L.
Opinion delivered by Justice Bridges.
Justices Evans and Whitehill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered July 20, 2017.